THIS OPINION IS
A PRECEDENT
OF THE T.T.A.B.

Mailed:
January 24, 2014

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————

**Trademark Trial and Appeal Board**

————

Peter Turdin, Jr.

v.

Trilobite, Ltd.

————

Concurrent Use No. 94002505

————

Stephen E. Nevas of Nevas, Capasse & Gerard LLC and Julianne
B. Bochinski of the Law Office of Julianne B. Bochinski for
Peter Turdin, Jr.

W. Scott Harders and Chad Rothschild of Brennan Manna
& Diamond, LLC for Trilobite, Ltd.

————

Before Zervas, Kuhlke and Adlin, Administrative Trademark
Judges.

Opinion by Zervas, Administrative Trademark Judge:

On April 4, 2009, concurrent use applicant Peter

Turdin, Jr. ("Turdin") filed an application, without any

geographic restrictions, to register the mark TRILOBITE

PICTURES (in standard character form) for services

ultimately amended to "motion picture film production, and

animation services" in International Class 41.[1]  Turdin
disclaimed the exclusive right to use the term PICTURES.

### *Background*

In the first Office action, the examining attorney
advised that Turdin's mark may be refused registration under
Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), if
the mark of either of two earlier applications filed by
Trilobite, Ltd. ("Trilobite") registers.  Both applications
are for the mark TRILOBITE, in standard character form, one
for "audio recording and production" in International Class
41,[2] and the other for "video production services; video
recording services," also in International Class 41.[3]

On October 16, 2009, Turdin filed notices of opposition
opposing registration of both of Trilobite's applications on
the grounds of likelihood of confusion, non-ownership and
non-use of the mark, and the Board instituted Opposition
Nos. 91192358 and 91192370.

On June 11, 2010, Turdin amended his application to one
for concurrent use, and on August 9, 2010, his application

---

[1] Application Serial No. 77706923, filed April 4, 2009, asserting
use of the mark in commerce under Trademark Act § 1(a), and
asserting a date of first use anywhere and date of first use in
commerce of January 3, 2000.
[2] Application Serial No. 77689769, filed March 12, 2009, based on
use of the mark in commerce under Trademark Act § 1(a), and
asserting a date of first use anywhere of December 31, 1984 and
date of first use in commerce of December 31, 1986.
[3] Application Serial No. 77689792, filed March 12, 2009, based on
use of the mark in commerce under Trademark Act § 1(a), and
asserting a date of first use anywhere and date of first use in
commerce of December 31, 1985.

was suspended pending disposition of Opposition No. 91192358. However, on February 28, 2011, the Board consolidated the oppositions and granted Turdin's motion to convert the oppositions to a concurrent use proceeding. The assigned examining attorney then removed Turdin's application from suspended status, and the Office published Turdin's application for opposition on April 5, 2011.

On June 15, 2011, the Board initiated this proceeding, the application having not been opposed. *See* TBMP § 1113.01 (3d ed. rev. 2 2013).

Turdin's application includes the following concurrent use statement:

> The following are exceptions to Applicant's right to exclusive use of the mark: Trilobite, Ltd, doing business at 2811 Kersdale Road, Cleveland, Ohio 44124, who is using the trademark, "TRILOBITE" for services consisting of "audio recording and production", in I[nternational] C[lass] 041, as shown in U.S. Trademark application Serial No. 77/689769 since December 31, 1986; and "video production services", in I[nternational] C[lass] 041, as shown in US Trademark Application Serial No. 77/689792, since December 31, 1985 in a trading area consisting of Ohio and Michigan. The Applicant requests registration of the service mark "TRILOBITE PICTURES" identified in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq.) for the area comprising the State of Connecticut and New York, New York.[4]

---

[4] In its denial of a summary judgment motion, the Board advised the parties that "Inasmuch as Turdin states in the concurrent use statement that Trilobite's use is in Ohio and Michigan, but Trilobite's applications are unrestricted, the parties must clarify their specific trading areas at trial, and must be

3

### *The Record*

The record consists of the pleadings, the files of the involved applications and the following:

- Turdin's testimonial deposition (TTABVUE docket entry no. 25);

- the testimonial deposition of Scott Newell, Trilobite's president (TTABVUE docket entry no. 26);

- Turdin's notice of reliance on Trilobite's responses to two of Turdin's interrogatories and one request for admission (TTABVUE docket entry no. 21); and

- Trilobite's notice of reliance on two notices of opposition filed by Turdin to two of Trilobite's applications, Turdin's responses to several of Trilobite's interrogatories and requests for admissions, and printouts of various webpages (TTABVUE docket entry no. 22);

### *Evidentiary Issues*

1. Turdin submitted Trilobite's initial response to Turdin's interrogatory No. 1 with his notice of reliance, but did not submit Trilobite's supplemental interrogatory response.[5] Trilobite then filed with its notice of reliance (i) its supplemental interrogatory response, (ii) a statement under Trademark Rule 2.120(j)(5), 37 C.F.R. § 2.120(j)(5), and (iii) copies of the numerous documents it produced in accordance with Fed. R. Civ. P. 33(d) in responding to Interrogatory No. 1. Such documents include

---

mindful of whether their applications leave open territories in the United States."

"generally … invoices, billing statements, checks and similar materials; marketing, promotional and similar materials; work orders, work assignments, contracts, estimates and similar materials; and a TV screenshot." 22 TTABVUE at 6.[6]

Trilobite objects to Turdin's submission of the initial answer to Interrogatory No. 1 (seeking a description of Trilobite's trade channels) because it did not include Trilobite's supplemental response. This objection is overruled. Trademark Rule 2.120(j)(5) provides, inter alia, that the inquiring party may make an answer to an interrogatory of record by notice of reliance. It also provides that, if fewer than all of the answers to interrogatories are offered in evidence, the responding party may introduce under a notice of reliance any other answers to interrogatories which should in fairness be considered so as to make not misleading what was offered by the inquiring party. Thus, the remedy for any perceived unfairness by Trilobite was to submit the supplemental

---

[5] The supplemental response was served during the discovery period.

[6] Citations to the record in this opinion are to the TTABVUE docket entry number and the electronic page number where the document or testimony appears. Because the Board primarily uses TTABVUE in reviewing evidence, the Board prefers that citations to material or testimony in the record that has not been designated confidential include the TTABVUE docket entry number and the TTABVUE page number. For material or testimony that has been designated confidential and which does not appear on TTABVUE, the TTABVUE docket entry number where such material or testimony is located should be included in any citation.

response. Trilobite did so, submitting the supplemental answer and documents it produced under Fed. R. Civ. P. 33(d). Thus, we consider the supplemental answer and the documents provided by Trilobite under Fed. R. Civ. P. 33(d) in responding to the first interrogatory.[7] *See Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100 (TTAB 2007)(introduction of documents responsive to interrogatories pursuant to Fed. R. Civ. P. 33(d) permissible under notice of reliance); TBMP § 704.10 (3d ed. rev. 2 2013). However, because the interrogatory response provides virtually no information about the documents, and because Trilobite did not provide context and other information about the documents through testimony, their probative value is limited.

2. Turdin filed his "Concurrent Use Applicant Peter Turdin's Rebuttal Disclosures" on December 12, 2012, the day set in the Board's July 23, 2012 order for providing rebuttal disclosures. Because the rebuttal disclosures are intended only to serve as notice to the party in the position of defendant as to what evidence the plaintiff will or may *subsequently* introduce during its rebuttal period and is not itself a means for filing evidence, the evidence

---

[7] Trilobite's documents are relevant to the subject matter of the interrogatory.

submitted with the rebuttal disclosures has not been considered.[8]

3. Trilobite objects to Turdin's submission of Trilobite's response to Turdin's request for admission no. 6, which denies the request. Trilobite's objection is sustained; Trademark Rule 2.120(j)(3)(i), 37 C.F.R. § 2.120(j)(3)(i), permits submission under a notice of reliance of "an admission to a request for admission." In this case, Trilobite denied Turdin's request for admission; the rule does not extend to denials. *See also*, *Life Zone Inc. v. Middleman Group Inc.*, 87 USPQ2d 1953, 1957 (TTAB 2008).

## *Facts*

Turdin, a sole proprietor, commenced using TRILOBITE PICTURES in January 2000 in Wallingford, Connecticut. 25 TTABVUE at 9. Turdin is engaged in the production of fictional film and media, as well as directing films, writing scripts, editing films and film animation. *Id*. His films are "fictional feature length and somewhat shorter fictional films." Turdin Resp. to Inter. No. 2, 22 TTABVUE at 4. His clients are production companies that specialize in feature film production. 25 TTABVUE at 16. Turdin's "best known" example of one of the fictional works he

---

[8] Even if we had considered the evidence accompanying the rebuttal disclosure, the result in this case would not be any different.

produced is a film called "The Raven," "a dramatic adaptation of the poem by Edgar Allen Poe." *Id.* at 11. He also worked on a film titled "Laundry Night" and is working on a film titled "Midnight Brew." *Id.* at 13 – 15.

Trilobite, Limited was formed by Scott Newell in 1982. 26 TTABVUE at 25. According to Mr. Newell, he produces videos regarding sporting events and news stories, fictional works, and animations, under the TRILOBITE mark; has worked with companies that produce content for cable television shows, such as Food Network, DIY and HDTV, i.e., companies that require videos; and created animated works in 2012 and 2013. *Id.* at 6, 8, 45 and 50. In addition, Trilobite has "a lot" of clients in New York City, including the television companies NBC, ABC, CBS and Fox, which have offices in New York City; and while Trilobite has neither performed any work in nor received any orders from Connecticut, Trilobite's "products" with the TRILOBITE mark have appeared in Connecticut and "have been consumed by customers of video products in Connecticut." *Id.* at 16 and 49.

### *Analysis*

Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), provides:

> That if the Director determines that confusion, mistake, or deception is not likely to result from the continued use by more than one person of the same or similar marks under

8

conditions and limitations as to the mode or place of use of the marks or the goods on or in connection with which such marks are used, concurrent registrations may be issued to such persons when they have become entitled to use such marks as a result of their concurrent lawful use in commerce prior to (1) the earliest of the filing dates of the applications pending or of any registration issued under this Act ….

In *In re Beatrice Foods Co*., 429 F.2d 466, 166 USPQ 431, 436 (CCPA 1970), the Court identified two conditions precedent to the issuance of a concurrent use registration:

> The first, that the parties be presently entitled to concurrently use the mark in commerce, we view as being primarily jurisdictional in nature. As with a single applicant, we consider the extent of such actual use to be irrelevant so long as it amounts to more than a mere token attempt to conform with the requirement of the statute. *Cf. Fort Howard Paper Co. v. Kimberly-Clark Corp*., 55 CCPA 947, 390 F.2d 1015, 157 USPQ 55 (1968). The touchstone, however, is the requirement that there be no likelihood of confusion, mistake or deception in the market place as to the source of the goods resulting from the continued concurrent use of the trademark. Only in satisfying this standard, can the Patent Office be sure that both the rights of the individual parties and those of the public are being protected. Once there has been a determination that both parties are entitled to a federal registration, the extent to which those registrations are to be restricted territorially must also be governed by the statutory standard of likelihood of confusion.

*Id.*[9]

---

[9] The second condition – "that there be no likelihood of confusion, mistake or deception in the market place as to the source of the goods resulting from the continued concurrent use of the trademark" – focuses on the area of *actual* use by the applicant, not the area of use claimed in the application. *See Gray v. Daffy Dan's Bargaintown*, 823 F.2d 522, 3 USPQ2d 1306, 1309 (Fed. Cir. 1987) ("The issue of likelihood of confusion in

Thus, to establish his entitlement to registration as a concurrent user in Connecticut and New York City, Turdin must (i) demonstrate that he made lawful concurrent use of "TRILOBITE" in commerce prior to Trilobite's filing date of its applications, and (ii) establish that confusion, mistake or deception is not likely to result from his continued use of TRILOBITE in the area in which he concurrently uses the mark.

Turdin, as the concurrent use applicant, is the plaintiff in this proceeding, and "has the burden of proof of demonstrating its entitlement to a concurrent use registration." *Over the Rainbow, Ltd. v. Over the Rainbow, Inc.*, 227 USPQ 879, 883 (TTAB 1985). *See also*, *Gray*, 823 F.2d 522, 3 USPQ2d at 1308-09 (concurrent use plaintiff "was not 'entitled' to [a concurrent use] registration unless he also satisfied the 'touchstone' requirement of no likelihood of confusion with [the defendant's] use"); Trademark Rule 2.99(e), 37 C.F.R. § 2.99(e).

### *The First Condition – Lawful Concurrent Use By Turdin*

The evidence supports Turdin's contention that he began using his mark for his services prior to the filing date of Trilobite's applications (March 12, 2009). Turdin testified that he first formed TRILOBITE PICTURES in Connecticut in

---

this concurrent use proceeding was properly resolved by looking at the concurrent use applicant's area of actual use, not merely the area 'claimed' in his application.")

January 2000, which is before the filing date of Trilobite's applications. In addition, there is no evidence that Turdin's adoption of TRILOBITE PICTURES was not in good faith, or that Turdin had knowledge of Trilobite's prior use of TRILOBITE. *See Woman's World Shops Inc. v. Lane Bryant Inc.*, 5 USPQ2d 1985, 1987-88 (TTAB 1985) ("concurrent use rights arise where a party, in good faith and without knowledge of a prior party's use in another geographical area, adopts and uses the same or similar mark for the same or like goods or services within its own geographical area with a measure of commercial success and public recognition without any resulting confusion as to source"); *Olé Taco Inc. v. Tacos Ole, Inc.*, 221 USPQ 912, 915 (TTAB 1984) (where uncontroverted evidence established the concurrent use applicant's use before the excepted registrant's filing date, "[w]e have no reason to assume that this was other than an innocent use without notice of registrant's use and activity under the [involved] mark"). Thus, Turdin has met the requirement of "lawful use in commerce" prior to the earliest filing date of the applications involved in this proceeding.

### *Is There Overlapping Use?*

A central question in this case is whether both parties are using their marks in the same territories. *See Gray*, 823 F.2d 522, 3 USPQ2d at 1309 ("The issue of likelihood of

confusion in this concurrent use proceeding was properly resolved by looking at the concurrent use applicant's area of actual use, not merely the area 'claimed' in his application."); *CDS Inc. v. I.C.E.D. Management Inc.*, 80 USPQ2d 1572, 1580 (TTAB 2006). It is well established that where the trading territories of concurrent users overlap in actual use, that fact precludes the granting of concurrent use registrations. *See Gray,* 3 USPQ2d at 1308; *My Aching Back, Inc. v. Alfred Klugman*, 6 USPQ2d 1892 (TTAB 1988); *In re Place for Vision, Inc.*, 196 USPQ 267 (TTAB 1977); *Texas Meat Packers, Inc. v. Rueckert Meat Co.*, 143 USPQ 325 (TTAB 1964); *Central West Oil Corp. v. Continental Oil Co.*, 135 USPQ 469 (TTAB 1962).

*Turdin's Activities in Connecticut and New York City*

Turdin testified that his home address is in Connecticut; that he is the "sole person" involved with "Trilobite Pictures"; that "Laundry Night" and "Midnight Brew" were produced in Connecticut; and that "The Raven" was produced in New York City. 25 TTABVUE at 8, and 12 – 15. Turdin has established that he has used his mark in Connecticut and New York City.

*Trilobite's Activities in New York City*

Trilobite maintains that it works with companies that produce content for cable shows, such as Food Network, "DIY" and "HDTV," i.e., companies that require the production of

12

videos; that it works all over the United States including in New York City; and it has "a lot" of clients "in" New York City, including NBC, ABC, CBS and Fox, which have offices in New York City. 26 TTABVUE at 43. In addition, Mr. Newell testified that a "theme package" was marketed to WNBC in New York City during the 1980s. *Id*. at 14. As physical evidence in support, Trilobite relies on (i) a June 15, 1987 letter from WNBC in New York to Mr. Newell of "Trilobite" in which the author indicates disinterest in the "theme cuisine" package proposed by Mr. Newell; and (ii) a copy of a cassette labeled "Theme Cuisine" and "Trilobite." 22 TTABVUE 80 and 81.

Turdin counters that Trilobite's activities in New York City do not amount to use of the mark in New York City. He states at pp. 11 – 12 of his brief:

> Applicant [Trilobite] asserts that it does business with clients in New York who purchase the Applicant's video coverage of news and sports events. But, the Applicant's evidence does not show that any of its services were performed in New York, N.Y. To the contrary, those services have been performed elsewhere. An examination of the invoices provided with the Applicant's Exhibit H [found at 22 TTABVUE] discloses that Applicant's services have been performed away from New York, N.Y., in Ohio where the Applicant maintains offices, in neighboring Michigan and Pennsylvania and to a much lesser extent in California, Maryland and Texas but not in New York, N.Y.

An inspection of Trilobite's invoices and correspondence submitted with Trilobite's notice of reliance reveals correspondence and invoices bearing the mark

13

TRILOBITE addressed to a variety of businesses in New York City, but not for services actually performed in New York City.

In *First Niagara Insurance Brokers Inc. v. First Niagara Financial Group Inc.*, 476 F.3d 867, 81 USPQ2d 1375, 1378 (Fed. Cir. 2007), the Court of Appeals for the Federal Circuit, our primary reviewing court, addressed whether certain contacts by a Canadian insurance broker in the United States amounted to use of the mark in the United States. The Canadian broker had no physical presence in the United States, and was not licensed to act as an insurance broker other than in Canada. It sold insurance policies issued by United States-based underwriting companies, and sold policies through insurance brokers in the United States and to United States citizens having Canadian property. Additionally, it sold liability insurance to Canadian businesses that bring tourists to the United States; commercial liability policies to Canadian businesses doing business in the United States; and policy riders covering goods being shipped across the border by Canadian companies. The Canadian broker also provided insurance to Canadians to facilitate their travel to the United States, such as auto insurance policies with features that allow Canadians to legally operate a motor vehicle in the United States. When a claim arose from an incident occurring in the United

States, the Canadian broker facilitated the processing of that claim with the issuing underwriter.  The Federal Circuit found that this use was "more than ample" to satisfy the use requirement of Section 2(d).

As with the Canadian broker's activities in *First Niagara*, Trilobite's services need not be actually performed in New York City to find, for our purposes, that it has used TRILOBITE in New York City.[10]  In our view, *First Niagara* does not contemplate such a narrow reading of use of a mark in connection with services.  Thus, we find that Trilobite has used and continues to use its mark in New York City by virtue of its correspondence, contracts, billing and interaction with clients in New York City, and that it used its mark in New York City prior to Turdin's use of his mark in New York City.

In addition, in *Weiner King, Inc. v. The Weiner King Corp.*, 615 F.2d 512, 204 USPQ 820, 830 (CCPA 1980), the CCPA, the predecessor court to the Federal Circuit, stated:

---

[10] In *First Niagara*, the Court specified that the Canadian broker was not required to establish use of its mark in U.S. commerce. While the Court in *First Niagara* considered priority of use, we see no reasons why the principles set forth there regarding priority and likelihood of confusion should not apply in the context of concurrent use under Section 2(d).  *Id*. at 1387 ("In the proceedings below, the Board based its analysis on the assumption that an 'opposer's claim of prior use can succeed only if it has proved use of its marks in connection with services rendered in commerce lawfully regulated by Congress, as required under Section 45 of the Trademark Act, 15 U.S.C. §1127.'  Such an assumption was unwarranted, however, in light of the plain language of the statute, which merely requires the prior mark to

15

actual use in a territory was not necessary to establish rights in that territory, and that the inquiry should focus on the party's (1) previous business activity; (2) previous expansion or lack thereof; (3) dominance of contiguous areas; (4) presently-planned expansion ….[11]

In view of Trilobite's business activities under the TRILOBITE mark in New York City, which pre-date Turdin's use of his mark anywhere, we consider New York City to be included in Trilobite's territory of use.

*Use by Trilobite in Connecticut*

Mr. Newell testified as follows regarding Trilobite's activities in Connecticut.

**Q.** Apart from invoices, if there are any, do you have any other evidence of the use of the mark Trilobite in connection with audio or video services specifically provided to clients or customers in the state of Connecticut?

**A.** I think one of the issues here, and if I may explain, is that some of the products that I have done, my company has done, have appeared in Connecticut and, therefore –

**Q.** But that's not my question, sir.  My question is whether you have any evidence or any knowledge of audio or video services which you have provided to customers in the state of Connecticut?

**A.** If by "customers," does that include people who consume my product?

**Q.** No, it includes people with whom you do business.

---

have been 'used in the United States by another.'  15 U.S.C. §1052(d)") (citation to record omitted).

[11] The fifth *Weiner King* factor regarding "possible market penetration by means of products brought in from other areas" is not relevant.

> **A.** I don't have any direct evidence other than invoices. My products with the Trilobite mark have appeared in Connecticut and, therefore, have been consumed by customers of video products in Connecticut.

26 TTABVUE at 15 - 16. The testimony appears to address goods, namely, video tapes, and not Trilobite's services. At best the testimony is too vague to be probative and at worst implies no use in connection with the services. Moreover, there are no invoices sent by Trilobite to recipients in Connecticut in the record; and Trilobite does not refer to any such invoices in its brief. Without more information about its asserted use in Connecticut, such testimony is insufficient for us to conclude that Trilobite used its mark in Connecticut. We find that Trilobite has not established that it has used its mark in Connecticut.

*Use by Turdin outside of New York City and Connecticut*

To demonstrate that the parties are using their marks in the same areas outside of the territories proposed by Turdin, and that there is a likelihood of confusion in such areas, Trilobite maintains that Turdin has used his mark in locations *other* than Connecticut and New York. Trilobite relies on the following:

17

- A screen credit acknowledging Turdin's "Trilobite Pictures" in the movie "Laundry Night" screened in Massachusetts in September 2011;[12]

- Turdin's use of a distributor located in Portland, Oregon for one of Turdin's films, "The Raven";

- Turdin's "admission" to Trilobite's Fed. R. Civ. P. 36(b) request for admission no. 13, 22 TTABVUE at 5, stating:

> No. 13: Admit that Turdin is in the business of producing, creating, and distributing films, documentaries and other creative works throughout the United States and internationally.
>
> Turdin denies that he is "distributing" films or "documentaries" "throughout" the United States. This Request is otherwise admitted.

- Turdin's testimony that productions to which Trilobite Pictures has contributed services have been seen at "film festivals";[13] and

- Turdin's statement in a complaint filed in a civil action against a third-party for infringement of TRILOBITE PICTURES that Turdin "has been actively using the ["Trilobite Pictures"] trademark in commerce since 2000, including but not limited to the production of films, documentaries, and other creative works for use and

---

[12] According to Trilobite, Turdin contributed his services to this video production.
[13] 22 TTABVUE at 576.

18

distribution throughout the United States, as well as internationally."[14]

Trilobite concludes that "even if Turdin now confines his services to his home or business in Connecticut and his 'location' to New York, New York, the product of these affairs bearing the 'Trilobite Pictures' mark are spread far and wide in the trading territory of Applicant Trilobite." Brief at 28.

We find such use of Turdin's mark outside of New York City and Connecticut to be *de minimis* and not inimical to his contention that his use is restricted to New York City and Connecticut. The number of instances in which the mark appeared outside of New York City and Connecticut is small, there is no information or insufficient information about how and where the mark appeared, including approximately how many people viewed the mark, and the admission and allegation are so broad that they are meaningless. Support for our finding lies in *CDS*, *supra*, where the Board found CDS's actual use in certain states of the mark THE COPY CLUB was "de minimis and nebulous" and awarded those states to the opposing party. *CDS*, 80 USPQ2d at 1581. It considered that CDS had withdrawn from overlapping territory and that "the question of likelihood of confusion must be decided on the basis of the current territorial alignment and not on

---

[14] 25 TTABVUE at 19.

whether there is a likelihood of confusion if the marks were used in the same territory." *Id*. at 1584. According to the Board, "CDS's retreat from the overlapping territory prior to the close of the testimony period is effective in eliminating an area of potential likelihood of confusion." *Id*. at 1581.

Thus, Trilobite has not established that Turdin's mark has been used outside of Connecticut and New York City since Turdin amended his application on June 11, 2010 to one for concurrent use; both parties use their marks in New York City; and while Turdin uses his mark in Connecticut, Trilobite has not established use of its mark in Connecticut.

### *Likelihood of Confusion in the Overlapping Territory*

With the foregoing in mind, we next consider whether there is a likelihood of confusion if both parties use their marks in New York City, where they have overlapping geographic use. Our determination is based on an analysis of all of the facts in evidence that are relevant to the factors identified in *In re E. I. du Pont de Nemours & Co*., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973), bearing on the issue of likelihood of confusion. *See also*, *In re Majestic Distilling Company, Inc*., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In considering the evidence of record on these factors, we keep in mind that "[t]he fundamental

inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24 (CCPA 1976).

*The Services*

In considering the *du Pont* factor regarding the similarity or dissimilarity of the services, we limit our analysis to the identifications of services set forth in the involved applications. *See Octocom Systems Inc. v. Houston Computers Services Inc.*, 918 F.2d 937, 16 USPQ2d 1783 (Fed. Cir. 1990); *Canadian Imperial Bank of Commerce, National Association v. Wells Fargo Bank*, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987).

We turn first to Turdin's services, namely, "motion picture film production, and animation services" and Trilobite's "video production services; video recording services," and then to Turdin's services and Trilobite's "audio recording and production" services.

Trilobite argues that its "video production services" include "animation services"; and Mr. Newell testified Trilobite uses its mark in producing animation and documentaries. 26 TTABVUE at 46 and 48. Indeed, animation is included within "video production services," encompassing the production of animated videos, or videos which otherwise

21

include animation.  The services hence overlap in part.  As to the remaining services, Mr. Newell testified that "video companies … film companies … media companies.  They're all … pretty much the same thing now."  26 TTABVUE at 48.  Therefore, we find that (i) "video production services" and "video recording services," and (ii) "motion picture film production" services, are related.

With regard to Turdin's "motion picture film production, and animation services" and Trilobite's "audio recording and production," as noted, Mr. Newell testified video companies and media companies are all "pretty much the same thing now."  *Id*.  Moreover, we find that there is an inherent relationship between "motion picture film production" and "audio recording and production" in that sound and music featured in a motion picture film may also be the subject of audio recordings.  These services hence are related, too.

*Classes of Consumers and Trade Channels*

As noted, the parties' services are in-part identical and otherwise related.  In the absence of any limitations as to channels of trade in the involved applications, the parties' services are presumed to be offered in all normal channels of trade for such services and to all normal classes of consumers for such services.  *See Octocom*, 16 USPQ2d at 1787.  Thus, for Turdin's animation services and

Trilobite's video production services (which include the production of animated videos), the trade channels and purchasers are presumed to be the same.

As for the consumers and trade channels of Turdin's "motion picture film production, and animation services" and Trilobite's "audio recording and production services," again, because of the inherent relationship between these services, the same customer seeking movie or animation services may also require audio production services for the same film under production. Therefore, there is an overlap in the consumers and channels of trade for these services as well.

*The Marks*

We next consider the similarity or dissimilarity of the marks as to appearance, sound, connotation and commercial impression. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005). While we must consider the marks in their entireties, in articulating reasons for reaching a conclusion on the issue of likelihood of confusion, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark. *See In re National Data Corp*., 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985). We keep in mind that when marks would appear on identical

services, as they do in part here, the degree of similarity necessary to support a conclusion of likely confusion declines with respect to that class of services (in this case, the "video production services; video recording services"). *See Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698 (Fed. Cir. 1992).

Trilobite and Turdin's marks (both in standard character form) share the term TRILOBITE, with TRILOBITE being the first term in Turdin's mark and Turdin adding the highly descriptive or generic term PICTURES to his mark. "Pictures" is defined in relevant part as "Motion Picture," and "4 c *plural*: Movies."[15]  It is well-settled that descriptive or generic matter may have less significance in creating a mark's commercial impression and little weight in likelihood of confusion determinations. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir. 2000) ("Regarding descriptive terms, this court has noted that the 'descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.'").  Thus, with TRILOBITE being the first term in

---

[15] *See* online version of Merriam Webster's Dictionary located at http://www.merriam-webster.com/dictionary/picture.  The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd* 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), including online dictionaries that exist in printed format or have regular fixed editions.

Turdin's mark which purchasers would look to as the indicator of source for Turdin's services, which term is identical to the entirety of Trilobite's mark, we find that the marks are highly similar in sound, meaning, appearance and commercial impression.

*Conditions of Sale and Sophistication of Purchasers*

There is argument in the briefs on the *du Pont* factor regarding the conditions of sale and purchaser sophistication, but no evidentiary support for the arguments. We therefore find these factors to be neutral. We add, too, that even sophisticated purchasers are not immune from source confusion, especially in cases such as this, involving very similar marks and, in the case of the animation services, overlapping services. *See In re Research Trading Corp.*, 793 F.2d 1276, 230 USPQ 49, 50 (Fed. Cir. 1986), citing *Carlisle Chemical Works, Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970) ("Human memories even of discriminating purchasers … are not infallible.").

*Actual Confusion*

Turdin testified that he and Trilobite have co-existed for thirteen years without a single instance of confusion. 25 TTABVUE at 17 and 21. The absence of any instances of actual confusion is a meaningful factor only where the record indicates that, for a significant period of time, one

or both parties' sales and advertising activities have been so appreciable and continuous that, if confusion were likely to happen, any actual incidents thereof would be expected to have occurred and would have come to the attention of one or both of the parties.  The record does not reflect appreciable sales and advertising, and there is no evidence that would indicate that actual incidents of confusion would have come to the attention of either party.  Further, actual confusion is not necessary to show a likelihood of confusion.  *See Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 218 USPQ 390 (Fed. Cir. 1983).

*Number and Nature of Similar Marks Used on Similar Services*

The record reflects that one third-party named Emily Rumsey used TRILOBITE for films, documentaries, and other works in 2008.  26 TTABVUE at 35 – 40.  The use of TRILOBITE by one third-party does not render TRILOBITE commercially weak.  Moreover, the record is not clear that the third-party is still using TRILOBITE.  This factor is therefore neutral.

*Conclusion*

We have found the marks to be similar, and, with respect to the animation services, the parties' services, purchasers, and channels of trade are the same.  Turdin has not established that there is any significant or notable third party use of TRILOBITE.  Further, the factors

regarding actual confusion and the conditions of sale are neutral. In view thereof, we find that there is a likelihood of confusion between Turdin's mark and the mark of application Serial No. 77689792 for "video production services; video recording services." As far as the mark of application Serial No. 77689769 for "audio recording and production," we have found these services to be related to Turdin's services, and the consumers and channels of trade overlap. The *du Pont* factors regarding the sophistication of purchasers and purchasing conditions are neutral due to a lack of evidence. After careful consideration, we find that there is a likelihood of confusion between Turdin's mark for his services and Trilobite's mark for "audio recording and production" services. More specifically, confusion is likely in New York City if the parties both continue to use their marks there.

### *Connecticut*

Inasmuch as there is a likelihood of confusion if the marks are used in the same territories, we next consider whether Connecticut is sufficiently distinct geographically that confusion would not arise if we grant Turdin's claim to Connecticut while Trilobite receives registrations for the remainder of the United States. In making this determination, we consider the relevant *Weiner King* factors, namely, (1) previous business activity; (2) previous

27

expansion or lack thereof; (3) dominance of contiguous areas; and (4) presently-planned expansion. *Weiner King,* 204 USPQ at 830. In addition, we consider the Board's decision in *My Aching Back*, 6 USPQ2d at 1894, where the Board held against the concurrent use applicant based in part on the fact that (i) the parties' territories of use were contiguous, and (ii) there was no assertion by the concurrent use applicant that it would not advertise its mark in the other's territory.

There is no evidence of any previous business activity in, or planned expansion by Trilobite into Connecticut, and it can hardly be said, in light of Trilobite's volume of business in New York State and the absence of any evidence of any significant business in other states contiguous to Connecticut, that it has any dominance in areas contiguous to Connecticut. On the other hand, Mr. Newell testified that, in his experience, there is "quite an overlap of people who live in the Connecticut area and work in New York, so I find that sometimes I don't know if they're in Connecticut actually or in New York." 26 TTABVUE at 9. Additionally, the record demonstrates that Trilobite has provided services in the State of New York,[16] and has

---

[16] *See* invoice dated May 2, 2007 regarding work in Rochester, NY. 22 TTABVUE at 202.

28

contacts in New York City and sends its invoices to businesses in New York City.

It is Turdin's burden to establish that there is no likelihood of confusion under concurrent use of the marks. *Over the Rainbow,* 227 USPQ at 883. Turdin has not persuaded us through the record created in this case that confusion is not likely if Turdin is granted Connecticut as his concurrent use territory. Because Turdin has not met his burden, Turdin's concurrent use application must be refused insofar as it seeks rights in Connecticut. Further, because there is a likelihood of confusion from the concurrent use of Turdin's and Trilobite's marks for the identified services in New York City, where both parties are using their marks, Turdin's application must also be refused registration insofar as it seeks registration for New York City.

### *DECISION*:

Application Serial No. 77706923:

The application, owned by Turdin, for the mark TRILOBITE PICTURES for "motion picture film production, and animation services" is refused registration.

Application Serial No. 77689769:

Trilobite is entitled to an unrestricted registration of its mark TRILOBITE for "audio recording and production" for the entire United States.

29

Application Serial No. 77689792:

Trilobite is entitled to an unrestricted registration of its mark TRILOBITE for "video production services; video recording services" for the entire United States.